IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| REBECCA A. P.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-cv-430-DGW[2] |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for SSI in November 2015, alleging disability as of July 4, 2000. After holding an evidentiary hearing, an ALJ denied the application on July 11, 2018. (Tr. 59-72). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect her privacy. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 14.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.  The ALJ erred by impermissibly playing doctor when he independently interpreted the medical evidence to arrive at his RFC determination.

2.  The ALJ erred by finding Phillips' statements about the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence.

3.  The ALJ erred by failing to consider the combined effect of Phillips' impairments.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3]  Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the

---

[3]  The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes and regulations are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work?   20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled.   A negative answer at any step, other than at step three, precludes a finding of disability.   The plaintiff bears the burden of proof at steps one through four.   Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy.   *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).   The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Biestek v. Berryhill*, 2019 WL 1428885, at *3 (S. Ct. Apr. 1, 2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of

the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the date of the application. He found that plaintiff had severe impairments of diabetes, asthma/COPD, obstructive sleep apnea, degenerative disc disease with sciatica, history of mitral valve prolapse, obesity, depression, bipolar, anxiety, and post-traumatic stress disorder (PTSD).

The ALJ found that plaintiff has the residual functional capacity (RFC) to perform light work, in that she can lift, carry, push, and pull ten pounds frequently and occasionally. She can sit, stand and/or walk for six hours each in an eight-hour workday. She can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolding. She can occasionally stoop, kneel, crouch, and crawl. She can occasionally use her right lower extremity for operation of foot controls and occasionally reach overhead with her right upper extremity. She should avoid concentrated exposure to extreme cold, heat, humidity, fumes, odors, dust, gases, and areas of poor ventilation. She cannot work in levels with respiratory irritants similar to those found in chemical plants, automotive garages,

coal mines, farms, or grain silos.   She can learn and engage in rote tasks that require the exercise of little independent judgment or decision-making and can be learned from a short demonstration.   She must work in a stable setting where there is little change in terms of tools used, the processes employed, or the setting itself, and change, where necessary, is introduced gradually.   She would be unable to work a job that required her to engage in work-related interactions with the general public.   She could not perform jobs that involve working in close coordination with co-workers.   Therefore, she could work jobs that entail only occasional work-related interaction with her co-workers.   Lastly, she can perform jobs that entail no more than occasional interaction with her supervisor.

Plaintiff had no past relevant work.   Based on the testimony of a vocational expert, the ALJ concluded that plaintiff was not disabled because she was able to do jobs which exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

### 1.    Agency Forms

Plaintiff was born in 1968 and was fifty years old on the date of the ALJ's decision.   Her alleged date of onset was July 4, 2000.   (Tr. 245).   Plaintiff said she stopped working in October 2015 because of her conditions and because she

was fired for having sciatic nerve pain. She worked as a home health tech from 1990 to 2000 and as a housekeeper at a motel for less than a month in October 2015. (Tr. 250-251).

In a Function Report submitted in December 2015, plaintiff said she has a lot of trouble breathing, cannot be around a lot of people due to anxiety attacks, she cannot stand, bend down or lift anything without severe pain in her lower back, and said she cannot stand more than ten to fifteen minutes. She said she about collapses when she walks and cannot sit very long due to the severity of her back pain. (Tr. 263).

When asked what she does on a typical day, plaintiff said she cleans without getting much done and makes simple meals for herself and her mom because it hurts to stand. She cannot sit for very long. She said she does not sleep well because of her sleep apnea and her back pain. Plaintiff said she has trouble putting her shoes on, getting out of the bath tub, and has trouble going grocery shopping because of the standing, walking, and lifting. She is unable to mow her yard because of her back pain. She said she will go to church if she can handle her anxiety, and she will hang out with her sisters every now and then. She said she borrows her mother's cane a couple times a week. She said she can only walk two blocks before needing to stop and rest for fifteen to twenty minutes. (Tr. 263-269). In a later Function Report from April 2016, plaintiff said she can only walk one block before needing to stop and rest. (Tr. 312).

## 2.    Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in March 2018.   (Tr. 87).

Plaintiff said she spent time in prison, was released in September 2015 and was at a halfway house until October 2015.   She then moved in with her mother. (Tr. 92-93).

Plaintiff said she can only stand for about ten minutes at a time, and it has been that way for about ten years.   She said she worked in the kitchen washing pots and pans while in prison, but she was fired due to her back pain.   Plaintiff said her back pain has been severe for about six or seven years and gave it an eight to ten out of ten pain rating applicable to that time period.   She rated her pain level as a seven out of ten on the day of the hearing.   Plaintiff associated her back pain with a spinal injury she had when she was seven years old and fractured her spine. She also said she isolates herself in her room three to four days a week because she cannot be around people and feels like she is being attacked.   (Tr. 94-98, 103).

A vocational expert (VE) also testified.   The ALJ asked him a hypothetical question which corresponded to the ultimate RFC findings.   The VE testified that this person could do jobs such as sorter, bench assembler, and routing clerk.   The VE also said if an individual were unable to walk or stand for more than ten minutes at a time, that would erode all of the jobs identified by the VE.   (Tr. 106-108).

### 3.    Medical Records

In February 2015, plaintiff saw Elizabeth Mills, a prison physician assistant, complaining of moodiness, anxiety, snapping at people, gaining weight, and COPD. Her cardiovascular exam was normal, affect was anxious, and mood was appropriate.   PA Mills' assessment included bipolar disorder, COPD, and morbid obesity, and she increased her Amitriptyline dose.   (Tr. 390-392).

In May 2015, plaintiff submitted an Inmate Request to Staff form asking that she be put on different medication, and saying she was trying to lose weight by walking one mile a day and staying away from the kitchen.   (Tr. 419).   In July 2015, plaintiff saw Dr. Kruse, a prison physician, regarding dyspnea[4], diabetes issues, COPD, and depression.   His assessment included chronic COPD and bipolar disorder, and plans included medication changes and lab orders.   (Tr. 371-375).

In August 2015, plaintiff again saw Dr. Kruse, and he noted her affect was pleasant and cooperative, her cardiovascular exam was normal, and her mental health exam was within normal limits.   Dr. Kruse's assessment consisted of bipolar disorder, COPD, diabetes, and morbid obesity.   (Tr. 372-373).

Plaintiff was released from prison in September 2015 and presented to The H Group for an Adult Diagnostic Assessment.   She reported that she has issues with depression, irritability, social withdrawal, past suicidal ideation and one past

---

[4] Dyspnea refers to shortness of breath. https://www.mayoclinic.org/symptoms/shortness-of-breath/basics/definition/sym-20050890, visited on January 23, 2020.

suicidal attempt, but she manages her symptoms well with medications. She also reported various life traumas she went through, including being raped from the age of seven until twelve by her mother's husband, being physically and emotionally abused by several of her past husbands, and her son passing away in her arms. She reported that she took pain medication for back pain and reported that she could not to lift anything over twenty-five pounds due to said back pain. (Tr. 456-457, 460).

In September and October 2015, plaintiff presented to PA McMurphy, a primary care physician assistant, complaining of diabetes, depression, and thyroid problems. Plaintiff reported having dyspnea, apnea, feeling depressed, joint pain, and reported her pain as six out of ten. (Tr. 495, 497). PA McMurphy noted fatigue, hoarseness, cough, dyspnea on exertion, wheezing, cold intolerance, anxiety, depression, back pain, and joint pain. Plaintiff's physical exam was normal each visit, and PA McMurphy's assessment included bronchitis, bipolar disorder, anxiety, diabetes, sleep apnea, and COPD. (Tr. 489-499).

In October 2015, plaintiff presented to Dr. Sirikonda, a pulmonologist, to discuss COPD, asthma, emphysema, diabetes, and obstructive sleep apnea. She reported wheezing and coughing which wakes her up at night. The assessment included asthma and COPD, and the doctor ordered a chest x-ray, pulmonary function test, ambulatory oximetry, fractional exhaled nitric oxide, nicotine patches, nicotine gum, inhalers, and nasal spray. (Tr. 528, 530-531).

In November 2015, plaintiff underwent an Initial Psychiatric Evaluation to

establish care due to racing thoughts and nightmares.   (Tr. 505).

In December 2015, plaintiff saw Dr. Chandra, a psychiatrist, complaining of nightly racing thoughts and crying for no reason.   Dr. Chandra observed plaintiff as alert and oriented, not severely depressed or psychotic, and not suicidal.   Dr. Chandra diagnosed plaintiff with bipolar disorder.   (Tr. 579).   Later that month, plaintiff underwent a chest x-ray and no active chest disease was identified.   (Tr. 536).

On January 5, 2016, Dr. Leung, an internist, did a consultative exam.   Dr. Leung noted a generally normal physical exam, noted plaintiff is morbidly obese, and noted plaintiff's mental status as alert and oriented with an intact memory. Dr. Leung observed plaintiff walking with a mild to moderate limp, and his impression consisted of diabetes, history of mitral valve prolapse[5], low back pain with a decreased range of motion, leg pain, asthma and COPD, and plaintiff was mildly short of breath at rest.   (Tr. 512-513, 515).

That same day, Dr. Klug, a licensed clinical psychologist, did a consultative psychological exam.   Dr. Klug observed plaintiff walking with a steady gait.   The diagnostic impressions consisted of cocaine dependence, cannabis abuse, post-traumatic stress disorder, generalized anxiety disorder, and dysthymic disorder[6].

---

[5] Mitral valve prolapse refers to a "condition in which the heart's mitral valve doesn't work well. The flaps of the valve are "floppy" and may not close tightly. These flaps normally help seal or open the valve." https://www.nhlbi.nih.gov/health-topics/mitral-valve-prolapse, visited on January 23, 2020.

[6] Dysthymic disorder refers to a "smoldering mood disturbance characterized by a long duration (at least two years in adults) as well as transient periods of normal mood." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2719439/, visited on January 23, 2020.

Dr. Klug noted adequate attention span, good concentration, intact immediate memory, poor short-term memory with retrieval deficits, intact long-term memory, poor insight and judgment, and poor reasoning. Plaintiff reported worries, obsessions, and compulsive behaviors. (Tr. 523, 525-526).

Plaintiff returned to see Dr. Sirikonda on January 8, 2016, and reported having a cough with yellow sputum, wheezing and shortness of breath, and nocturnal symptoms every night. The doctor noted plaintiff's pulmonary function test was normal, her six-minute walk was normal, and her fractional exhaled nitric oxide study was normal. The doctor's impression included moderate persistent asthma, allergic rhinitis, and obstructive sleep apnea. The doctor encouraged smoking cessation, regular exercise, and weight loss. (Tr. 533, 535). A pulmonary function test produced normal results. (Tr. 864).

Plaintiff returned to see PA McMurphy on January 19, 2016, to address COPD and back pain. Plaintiff said her COPD symptoms include a cough that wakes her up at night, dyspnea at rest, morning cough, morning phlegm production and productive cough. Plaintiff reported her back pain severity level is moderate, it occurs persistently, it is aggravated by daily activities, and she denied any relieving factors. PA McMurphy's physical exam was normal, and the assessment included chronic obstructive pulmonary disease. (Tr. 563, 567).

In February 2016, plaintiff had a psychiatry visit in which Dr. Chandra noted plaintiff was doing well on her medicine, was alert and oriented, did not appear distressed or psychotic, and her insight and judgment was intact. Dr. Chandra

diagnosed plaintiff with bipolar disorder, continued plaintiff on Zoloft and Requip, increased Seroquel, added Effexor and Hydroxyzine, and discontinued Buspar. (Tr. 577).

On March 1, 2016, plaintiff established care with Benedicta Odemerho, a family nurse practitioner, complaining of chest pains, a racing heart, shortness of breath, and sinus pressure with congestion. (Tr. 669). Her assessment included acute maxillary sinusitis, asthma, emphysema, diabetes, depression, and anxiety. (Tr. 672). On March 10, 2016, a Plethysmography Report indicated plaintiff had a minimal obstructive lung defect, and a pulmonary function test revealed an isolated decrease in diffusing capacity which may suggest a pulmonary vascular disease. (Tr. 675-677).

In May 2016, plaintiff underwent a "Comprehensive Mental health and/or Substance Abuse Assessment" performed by Larry Knopp, a licensed practitioner of the healing arts (LPHA). Plaintiff said she sought treatment due to sexual abuse as a child, abuse by her husband, her son's death, drinking, prison, and racing thoughts. She reported depressive, manic, anxious, ADD/ADHD, and psychotic symptoms. (Tr. 606, 608). Plaintiff reported her low back pain is sometimes at a ten on a one to ten scale, and said her pain interferes daily with her activities. (Tr. 618). In the assessment, LPHA Knopp rated plaintiff as having "Moderate functional impairments" regarding problem solving, alcohol/drug use, productivity, and coping skills. (Tr. 627). LPHA Knopp diagnosed plaintiff with bipolar disorder and post-traumatic stress disorder. (Tr. 634).

In October 2016, plaintiff presented to Dr. Sirikonda for a pulmonary follow up and complained of coughing, intermittent wheezing, nasal drainage and shortness of breath. Dr. Sirikonda's impression included moderate persistent asthma, morbid obesity, allergic rhinitis, and plans included a sinus CT scan, a blood test, and allergen tests. Dr. Sirikonda suggested plaintiff's symptoms may be exacerbated by smoking and obesity, so he strongly recommended smoking cessation and weight loss. (Tr. 694, 696-697).

In February 2017, Binh Nguyen, D.O., a cardiologist, wrote a letter saying, from a cardiac standpoint due to chest pain and shortness of breath, plaintiff should not lift more than ten pounds and said cardiac symptoms worsen when performing heavy lifting. (Tr. 692).

In March 2017, plaintiff presented to Veronica Schaufelberger, a family nurse practitioner, and the assessment included acute non-recurrent frontal sinusitis, lumbago with sciatica[7] and other chronic pain. (Tr. 762).

In April 2017, plaintiff presented to Melanie Cross, a family nurse practitioner, at the Orthopaedic Center of Southern Illinois complaining of buttock, low back pain, and left leg pain to her foot, and reported her current pain at a ten out of ten. (Tr. 773). Plaintiff later presented to APN Schaufelberger, and the assessment included acute recurrent frontal sinusitis and bilateral acute serous

---

[7] Lumbago with sciatica refers to "pain radiating from the lower back down into your leg." https://www.injurymap.com/diagnoses/lumbar-sciatica, January 23, 2020.

otitis media[8].   (Tr. 764).

Plaintiff presented to Beth Heaney, an advanced practice nurse, on May 1, 2017, for a medication follow up because her aunt passed away, along with a number of others since her last appointment.   The assessment and plan included recurrent major depressive episodes, chronic post-traumatic stress disorder, Wellbutrin, Trazodone, Requip, and Klonopin.   (Tr. 755).

On May 9, 2017, plaintiff presented to a physical therapist, PT Holzhauer, to address her sacroiliac joint[9] pain.   Plaintiff said the pain is progressively worse, was much worse than the previous year, said the pain is frequent, and rated the pain at an eight out of ten.   Plaintiff said lifting, vacuuming, bending, and standing all aggravate her back.   She said she limits her standing to ten minutes, will sit for five to ten minutes to rest, and she has to stop every twenty minutes when push-mowing her yard.   PT Holzhauer diagnosed plaintiff with low back pain and sacroiliac dysfunction, and recommended plaintiff be seen twice a week for four weeks.   (Tr. 723, 726).   Plaintiff later presented to PT Andrade for a physical therapy appointment.   Plaintiff reported lower back and buttocks pain at a pain level of eight out of ten but left reporting a pain level of three out of ten after treatment.   (Tr. 719).

---

[8] Serous otitis media refers to "a condition in which fluid resides in the middle ear." https://www.verywellhealth.com/serous-otitis-media-1192122, visited on January 23, 2020.
[9] "The sacroiliac joint connects the sacrum (triangular bone at the bottom of the spine) with the pelvis (iliac bone that is part of the hip joint) on each side of the lower spine." https://www.spine-health.com/conditions/spine-anatomy/sacroiliac-joint-anatomy, visited on January 23, 2020.

Plaintiff presented to APN Schaufelberger on May 19, 2017, and the assessment included diabetes, vitamin D deficiency, chronic obstructive pulmonary disease, and lumbago with sciatica. (Tr. 759). Plaintiff then presented to a physical therapist assistant, PTA Marshel, for her back pain and rated her pain a ten out of ten. Plaintiff reported aching and sharp pain, and said she changes positions often and tries not to stand much. (Tr. 728).

On May 25, 2017, plaintiff presented to FNP Cross complaining of low back pain and rated her pain as a three out of ten after coming straight from physical therapy. Plaintiff said physical therapy only relieves the pain for a short period of time and said she still has difficulty with standing, bending, exercise, and walking for long periods of time. FNP Cross ordered an MRI of the lumbar spine and a low profile back brace. (Tr. 786). An MRI performed on May 31, 2017, showed degenerative change throughout lumbar spine and at T11-T12 level, along with severe bilateral L5-S1 neural foraminal encroachment[10]. (Tr. 778).

On June 4, 2017, plaintiff presented to Dr. Sirikonda complaining of asthma, allergic rhinitis, obstructive sleep apnea, and morbid obesity. Dr. Sirikonda ordered medication for acute bronchitis and encouraged smoking cessation and exercise. (Tr. 824, 827-828). Plaintiff underwent a walk test on June 14, 2017, and the results came back normal and stable. (Tr. 851).

---

[10] Encroachment refers to "the process by which spinal spaces, such as the foramina or the spinal canal, become occupied by a piece of tissue that does not belong there." https://www.verywellhealth.com/encroachment-296766, visited January 23, 2020.

In July and August 2017, plaintiff received steroid injections in her back by Dr. Smith, a pain medicine physician. The post-procedure diagnosis consisted of low back pain and advanced degenerative disc disease at L5-S1 with bilateral L5-S1 foraminal stenosis[11], and plaintiff's pain decreased from a ten out of ten to a three/four out of ten after injection. (Tr. 787-788, 791).

In October 2017, Plaintiff presented to Tamara Copeland, a nurse practitioner, complaining of sinus infections, coughing at night, and postnasal drainage, and said she never started the nasal spray as her insurance would not cover it. NP Copeland instructed plaintiff to take Flonase, do nasal flushes, ordered blood work, and instructed plaintiff to exercise and quit smoking. (Tr. 816, 820). Plaintiff presented to APN Heaney and said she felt tired and stayed in her room all the time, cried more, expressed concern about her aunt dying, and said one of her friends died two weeks prior. APN Heaney increased plaintiff's Lexapro dose, suggested plaintiff take Klonopin as needed for anxiety, and suggested certain habits for better sleep hygiene. (Tr. 794-795).

In November 2017, plaintiff presented to FNP Cross and said she did get a great deal of relief from the steroid injection in her back for about one week. FNP Cross noted axial back pain on physical examination. (Tr. 800).

---

[11] Foraminal stenosis refers to "the narrowing of the cervical disc space caused by enlargement of a joint (the uncinate process) in the spinal canal. https://www.spine-health.com/glossary/foraminal-stenosis, visited on January 23, 2020.

## 4.    State Agency Consultants' Opinions

Julian Pardo, M.D., a pediatrician retained by the state, reviewed the record and considered plaintiff partially credible, stating she walked with a mild to moderate limp and could tandem walk as well as toe and heel walk.  He said plaintiff could occasionally lift and/or carry twenty pounds and frequently carry and/or lift ten pounds, stand and/or walk about six hours in an eight-hour work day and could sit about six hours in an eight-hour work day.  He said she could push and/or pull, climb ramps and stairs, and balance without limitation.  He said she could climb ladders, ropes, and scaffolds occasionally, could stoop, kneel, crouch, and crawl frequently, and said her lumbar spine range of motion was reduced to ten degrees of extension on recent exam.   (Tr. 118-119).

James Greco, M.D., an internist retained by the state, reviewed the record and said plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds.  She could stand and/or walk about six hours in an eight-hour work day, could sit about six hours in an eight-hour work day and could push and/or pull with limitations regarding her lower right extremities.  He said she could occasionally climb ladders, ropes, and scaffolds, could frequently climb ramps and stairs, and could balance without limitations.   (Tr. 138-139).

## 5.    Dr. Nguyen's Opinion

Dr. Nguyen wrote a note on February 23, 2017, recommending, from a cardiac standpoint, plaintiff should not lift more than ten pounds due to chest pain

and shortness of breath as those symptoms are exacerbated when performing heavy lifting.  (Tr. 692).

<h3 style="text-align:center"><u>Analysis</u></h3>

First, plaintiff asserts the ALJ played doctor by independently interpreting medical evidence.

Plaintiff argues that the ALJ misconstrued the results of plaintiff's MRI of her lumbar spine and therefore "played doctor" because the two State agency doctors, Dr. Greco and Dr. Pardo, reviewed the file prior to the MRI results.  The ALJ addressed in his decision that Dr. Greco and Dr. Pardo both had not reviewed it. However, the ALJ went on to explain how they did review the consultative examiner's report which supported their thoughts on plaintiff's lumbar spine issues, and that was in correlation with the MRI results per the radiologist.

Also, it cannot be said that the ALJ independently interpreted the MRI results when any statement the ALJ made regarding said results was pulled directly from the radiologist's findings and impressions.  In *McHenry v. Berryhill*, the court decided the ALJ erred by interpreting an MRI himself rather than having a doctor explain the significance.  911 F.3d 866, 871 (7th Cir. 2018).  The facts in *McHenry* are distinguishable from the one at hand.  In *McHenry*, the ALJ independently compared MRI results with prior medical records to decipher whether the impairments "actually existed at the same or similar level." *Id*. Notably here, the ALJ did not rely on his own interpretation of the MRI.  Instead,

he relied on the radiologist's interpretation as set forth in the MRI report, and simply restated the radiologist's findings and impressions. Therefore, plaintiff's arguments to this point hold no weight.

Plaintiff also argues the ALJ mischaracterized the results of the MRI. Plaintiff's assertions are incorrect, and said assertions are simply an effort at plucking differences between things that are not actually contradictory. The radiologist's impression of the MRI said, "Degenerative change throughout lumbar spine and at T11-T12 level. Severe bilateral L5-S1 neural foraminal encroachment and other findings as detailed above." (Tr. 778). Plaintiff focuses on how the radiologist's findings showed no "central canal spinal stenosis," while claiming the ALJ erred by simply saying there was "no stenosis." There is no error or mischaracterization of the results when an ALJ simply paraphrases findings straight from the MRI report itself.

Secondly, plaintiff also asserts the ALJ erred by finding that plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence.

SSR 16-3p supersedes the previous SSR on assessing the reliability of a claimant's subjective statements. SSR 16-3p became effective on March 28, 2016 and is applicable here. 2017 WL 5180304, at *1. The new SSR eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529.

*Ibid.* at *10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding his symptoms. Thus, prior Seventh Circuit precedents continue to apply.

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

Plaintiff argues that the ALJ's application of whether plaintiff's statements "were entirely consistent with the medical evidence and other evidence" was meaningless boilerplate. This argument is borderline frivolous. The "not entirely consistent" language is, as plaintiff asserts, boilerplate language that appears in many ALJ decisions. However, the use of boilerplate language is harmless where the ALJ goes on to give his reasons for his decision. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). The use of the phrase "not entirely consistent" does not suggest that the ALJ used an incorrect standard. The ALJ cited the correct standard at Tr. 66 and discussed the relevant factors in

assessing plaintiff's allegations.

Plaintiff argues the ALJ failed to use appropriate questioning by not asking more questions regarding plaintiff's back pain and her ability to walk. Plaintiff furthers her argument by saying the ALJ should have asked more questions to obtain clarification because the plaintiff suffers from mental illnesses. However, during the hearing, the ALJ asked multiple varying questions regarding plaintiff's back at Tr. 94, 95, 97, 98, and 99. Furthermore, plaintiff's attorney asked questions regarding plaintiff's back pain. Because plaintiff was represented by an attorney, it was presumed she put on her best case for benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007).

Plaintiff argues that the ALJ omitted how back injections decreased plaintiff's pain for only one week at Tr. 68. It is true there is no language in the ALJ decision that mentions how plaintiff had relief for only a week at a time. However, this omission alone is not enough to require remand. The ALJ furthers his discussion of back pain in the next paragraph stating the significant contradictions in the objective evidence regarding plaintiff's pain, and said contradictions speak directly to the credibility issue.

Additionally, plaintiff argues that the ALJ's reference to her continued smoking was error, citing *Shramek v. Apfel*, 226 F.3d 809, 812-13 (7th Cir. 2000). *Shramek* did hold that the ALJ erred in discounting the plaintiff's statements because she continued to smoke. However, in that case, there was no evidence linking the plaintiff's symptoms to her smoking. Here, in contrast, there was such

evidence, as the ALJ pointed out at Tr. 68. Plaintiff supports her argument by also citing to 20 C.F.R. § 404.1530 saying this regulation requires that the ALJ must find that if the claimant followed prescribed treatment, it would restore the ability to work. However, this regulation is of no concern here. Plaintiff was counseled about the health risks of smoking, and plaintiff was offered medical treatment for cessation. However, plaintiff said she was not interested in obtaining medical help and was not ready to quit. (Tr. 820). Additionally, plaintiff was encouraged many times by medical professionals to quit smoking due to her conditions, but plaintiff never did. (Tr. 535, 697, 820, 827).

Furthermore, plaintiff ignores how the ALJ had additional reasons for his credibility determination regarding the multiple conflicts between what plaintiff said and what she reported within the medical records. There were normal physical exams and essentially benign mental status exams during plaintiff's medical care. Also, there are the questionable events of January 5, 2016, where Dr. Leung observed plaintiff walking with a mild to moderate limp. However, that same day Dr. Klug observed plaintiff walking with a steady gait. During the hearing, plaintiff said she stopped working at the kitchen while in prison because of her impairments. However, prison records reflect that plaintiff quit working in the kitchen because she could not resist the easy access to junk food. Additionally, plaintiff said she could walk a mile while in prison, yet she said at the hearing that she could walk no more than ten minutes at a time. Therefore, this Court agrees with the ALJ that plaintiff's subjective assertions were not consistent with the

objective findings and records.

Lastly, plaintiff asserts the ALJ erred by failing to consider the combined effect of plaintiff's impairments.

"When assessing if a claimant is disabled, an ALJ must account for the combined effects of the claimant's impairments, including those that are not themselves severe enough to support a disability claim." 42 U.S.C. § 423(d)(2)(B). *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018). "The combined effects of the applicant's impairments must be considered, including impairments that considered one by one are not disabling." *Williams v. Colvin*, 757 F3.d 610, 613 (7th Cir. 2014).

Plaintiff alleges the ALJ failed to incorporate all the limitations that are supported by the record in his RFC assessment and hypothetical question posed to the VE, including plaintiff's obesity, asthma, and allergic rhinitis. Plaintiff goes on to say, "The ALJ does not explain why Phillips is not more limited in her ability to lift given the ALJ's finding that each one of these impairments, standing alone, limits her lifting to no more than 10 pounds." The Court agrees with defendant that plaintiff is essentially asking for something she already received.

Here, the ALJ accounted for plaintiff's obesity in his RFC determination when he said, "Nevertheless, the undersigned further limits the claimant's ability to climb ladders, ropes, or scaffolding to never due to her obesity…" (Tr. 69-70). The ALJ addressed plaintiff's asthma at Tr. 68, explaining that her breathing issues are well-controlled with inhalers but are exacerbated by weather, such as humidity. (Tr.

698).   The ALJ accounts for this in his RFC determination when he said, "Therefore, the claimant has been limited accordingly to avoiding concentrated exposure to pulmonary irritants, extreme temperatures, and humidity."   (Tr. 68). In regards to the ALJ's alleged failure to recognize plaintiff's allergic rhinitis, the failure to recognize it as a separate diagnosis is irrelevant.   Plaintiff does not argue that her rhinitis has any effect on her ability to work, and the medical records do not suggest as much.   For these reasons, the Court rejects plaintiff's third issue.

This is not a case in which the ALJ failed to discuss evidence favorable to the plaintiff or misconstrued the medical evidence.   Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence.   She has not identified a sufficient reason to overturn the ALJ's conclusion.

Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence.   *Burmester*, 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence.   Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE: February 21, 2020.**


**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**